Birch Ranch and Oil Company v. Commissioner.
Birch Ranch & Oil Co. v. Commissioner
Docket No. 109993.
United States Tax Court
1944 Tax Ct. Memo LEXIS 284; 3 T.C.M. (CCH) 378; T.C.M. (RIA) 44128; April 20, 1944
*284 George Acret, Esq., 650 S. Grand Ave., Los Angeles, Calif., for the petitioner. W. Frank Gibbs, Esq., and Earl C. Crouter, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income and excess profits taxes against the petitioner as follows: Excess
Fiscal
Income
Profits
Year Ended
Tax
Tax
September 30, 1937
$18,234.70
$ 56.58
September 30, 1939
8,931.10
6,495.35 The questions presented are whether the respondent erred in disallowing a deduction of $119,400, taken by petitioner in each of the taxable years, as interest accrued on bonds of a reclamation district in which property of the petitioner was situated, and whether the petitioner was in error in reporting as gross income for 1937, $52,280.12 received by it under an option to sell an easement for flowage rights over a part of its property. Other issues raised by the pleadings have been abandoned. Findings of Fact The petitioner is a Nevada corporation, with its principal office in Los Angeles, California. Its income tax returns for the years involved herein were filed with the Collector of Internal Revenue in that city. *285 The Menges Oil Company, a corporation, was the owner of partially developed oil lands in the Brea Oil Field, in Orange County, California. The stock of the corporation was owned by A. Otis Birch, his wife, M. Estelle C. Birch, B. F. Conaway, his wife, Anna M. Conaway, Louise Smith and her sister, Ruth Smith. The Conaways were the parents of Mrs. Birch, and the Smith sisters were the nieces of Birch. Louise Smith married C. Harold Hopkins, and Ruth his brother, J. J. Hopkins. They are commonly referred to in this proceeding as the Hopkins sisters. Birch and his wife and Conaway and his wife owned in equal amounts 70-17/18 percent of the stock of the Menges Oil Company and the Topkins sisters similarly owned the balance of 29-1/18 percent. The Menges Oil Company was dissolved in September 1911, and its assets were transferred to a partnership known as Birch Oil Company. The stockholders of the Menges Oil Company became partners in the Birch Oil Company and their interests in the partnership were in the same proportions as their stock ownership in the corporation had been. In 1914 Birch Oil Company purchased about 13,000 acres of overflow lands situated about five miles from Sacramento, *286 in Yolo County, California, and in the Sacramento River Valley. The lands were purchased for use in farming and stock raising, and came to be known as the Conaway Ranch. Additional acreage was thereafter purchased and by 1918 the ranch contained about 20,000 acres. All purchases had been made at $35 per acre. At the time of the original purchase in 1914, the Sacramento and San Joaquin Drainage District, created under the laws of California, had started a flood control project in Sacramento River Valley. The project called for the acquisition of a by-pass, known herein as Yolo By-pass, across the Conaway Ranch, for the passage of excess floodwaters of the Sacramento River and its tributaries. In 1914, when Birch Oil Company purchased the first of the lands comprising the Conaway ranch, the by-pass was being surveyed, and it was expected that about one-half of the ranch would be taken for that purpose. The Reclamation Board of the State of California informed Birch Oil Company that if it would construct a levee across its ranch property, adjacent to the by-pass, an assessment would be made against all the lands in the Sacramento and San Joaquin Drainage District to pay Birch Oil Company *287 for flowage rights through the by-pass and for the construction of the levee. Birch Oil Company expected to receive $25 an acre for the acreage used for the by-pass. Such acreage, according to law, could not be fully reclaimed and was suitable only for grazing. Desiring to reclaim and develop the lands comprising the Conaway Ranch, the Birch Oil Company, in 1918, filed a petition with the Board of Supervisors of Yolo County, California, for the creation of a reclamation district which would include 24.210 acres and would cover the whole of the Conaway Ranch and twenty-odd other parcels of land not owned by the Birch Oil Company or its members. In April 1919, the establishment of Reclamation District No. 2035, comprising approximately 21,000 acres, was approved by the Board of Supervisors. Excluded from the district as approved were some 1,300 acres of the Conaway Ranch and all except eight of the twenty-odd other parcels of land not owned by the Birch Oil Company or its members. Organization of the district was completed and the County Board of Supervisors appointed Conaway, C. Harold Hopkins, and a man named Armfield as trustees for the district. In June 1919, the trustees employed *288 an engineer and directed him to prepare plans for the reclamation and irrigation of lands in the district, with estimates of the cost of the necessary improvements. In a proceeding brought by the trustees to determine the legality of the district, the Superior Court of California in and for the County of Yolo, in June 1920, entered its judgment that Reclamation District No. 2035 is "a duly and regularly organized and legal Reclamation District." In the same month, the trustees approved the plans submitted by the engineer and his estimate of $2,264,740 as the cost of the improvements. The plans submitted called for the construction of the main levee along the edge of the Yolo By-pass, as above described. The plans were approved by the Reclamation Board of the State of California in October 1920, and in December of the same year, by the Board of Supervisors. Commissioners of assessment were appointed to assess the value of the benefits to the lands in the district from the improvements contemplated and to apportion the cost of the said improvements according to the benefits that would accrue to each tract of land in the district. Thereafter, and prior to July 2, 1924, the commissioners *289 made the assessment and apportionment for which they were appointed. The assessment was approved by the Board of Supervisors on July 23, 1924, and the list of assessment was filed on the same day with the County Treasurer of Yolo County. The Birch Oil Company, under the direction of the district's engineer, built the improvements called for in the reclamation plan and financed all the costs, which were slightly in excess of two million dollars. The work was substantially completed by 1925, at which time the improvements consisted of 45 miles of roadways, 47 miles of irrigation canals, 55 miles of drainage canals and ditches, and included bridges, pumping plants and other structures necessary for the development of the lands in the district. By 1925 Birch had acquired individually and at undisclosed costs seven of the eight parcels of land which with the Conaway Ranch comprised the land of the district. The parcel not so purchased consisted of 240 acres. In the meantime, the Hopkins sisters, being desirous of disposing of their interests in the Conaway Ranch, by agreements dated January 1, 1924, sold such interests to Birch and Mrs. Birch for $787,000, an amount designed to pay them *290 their proportionate part of the Birch Oil Company funds invested in the ranch. Under the agreements each of the sisters agreed to accept bonds of Reclamation District No. 2035 in the principal amount of $393,000 and cash in the sum of $500. Birch and his wife agreed to cause the district to issue bonds in an amount of at at least $800,000, which were to constitute a prior lien on all of the property in the district, and further promised to deliver on or before February 1, 1925, to each of the sisters the amount of the bonds and cash called for by the agreements. Birch and his wife were to have immediate and absolute possession and control of the properties acquired from the Hopkins sisters and were to be entitled to all rents and profits of every kind therefrom and were to assume all liabilities and burdens incident to the ownership thereof. The bonds not having been issued at the time of the agreements on January 1, 1924, Birch gave to each of the sisters his promissory note in an amount equal to the amount of the bonds she was entitled to receive under the agreements. The notes were to run for 10 years and were to draw interest at 6 percent per annum from January 1, 1924, for a *291 period of 5 years, and at 7 percent thereafter. Birch had the option of paying the notes in full at any time prior to the expiration of the 10-year period. According to the minutes, the landowners, at an election held on August 28, 1924, voted to issue bonds to pay for the reclamation work which had been done, and on October 26, 1924, the trustees adopted resolutions providing for the issuance of the bonds. On January 5, 1925, the trustees of the district adopted resolutions directing that the district pay Birch and Conaway $2,000,000 for moneys advanced in the construction of the improvements; that Warrant No. 1 of the district be issued to them in that amount; that the bonds of the district be placed in the hands of the County Treasurer; and that the County Treasurer be requested to advertise the bonds for sale at the earliest possible date. On the same day Warrant No. 1 for $2,000,000, drawn on the Treasurer of Yolo County, was issued to Conaway and Birch. The warrant was approved by the Board of Supervisors of Yolo County and was presented for payment to the County Treasurer but was not paid for want of funds. On January 7, 1925, the trustees of the district delivered to the *292 County Treasurer bonds of the district totaling $2,264,740. The bonds were dated January 1, 1925, and bore interest at the rate of 6 percent per annum until paid. They were in denominations of $1,000. The first $227,000 thereof were to mature on January 1, 1935, with a like amount maturing on January 1 of each year following until January 1, 1944, when the bonds then remaining and amounting to $221,740, were to mature. Also on January 7, 1925, the County Treasurer gave notice that on January 23, 1925, he would sell Bonds Nos. 1 to 2,000, inclusive, of $2,000,000 par value, to the highest bidder, and stated that outstanding warrants of the district, with accrued interest thereon, would be accepted in payment for the bonds. Birch, acting for himself, Mrs. Birch and the Conaways, was the highest bidder, his bid being $2,000,000 plus accrued interest. Being the highest bidder he became the purchaser of the bonds and gave in payment therefor Warrant No. 1 of the district, which had been received by him and Conaway in payment for the building of the improvements for the district. In a proceeding brought by the trustees of the district, the Superior Court of California in and for the County *293 of Yolo, on March 2, 1925, entered its judgment "that said bonds are a valid legal obligation of said Reclamation District No. 2035." Upon receipt of the bonds of the district, Birch delivered to each of the Hopkins sisters $393,000 par value of such bonds, or a total of $786,000, pursuant to the agreements of January 1, 1924, whereunder he and his wife had acquired from the Hopkins sisters all of the interests of the latter in the Conaway Ranch. Upon delivery of the bonds, the Hopkins sisters delivered to Birch the promissory notes covering the purchase price of their interests in the ranch which had been received from him at the time of the January 1, 1924 agreements. At the same time they made formal conveyance to Birch and his wife of all their interests in the Conaway Ranch. At or about the same time and pursuant to the terms of agreements dated January 10, 1925, the Hopkins sisters granted to Birch and his wife the right to purchase the bonds received by them as above set forth, at the prices and on the terms set forth in the said agreements. According to these agreements, Birch and his wife offered and agreed to purchase at face the bonds in question, the purchases from each *294 sister to be made in installments of $39,300 on January 1, 1926, and on January 1 of each year thereafter until January 1, 1933, with a final installment of $78,600 on January 1, 1934, and on each purchase date to buy all matured coupons appertaining to the bonds covered in the particular installment. At each installment date the sale of the bonds by the Hopkins sisters to Birch and his wife was to be completed at the option of the Hopkins sisters. To assure payment for the respective installments of the bonds, Birch and his wife agreed to deliver to B. F. Conaway and C. Harold Hopkins, as trustees, the balance of the district's outstanding bonds in the amount of $1,214,000, and upon default in the payment of any of the above installments, the Hopkins sisters were to be permitted to sell, or have sold, so much of the bonds held in trust as should be required to pay the amount in default. The trustees might also release to Birch and his wife such of the bonds as might be required by them as a pledge for money borrowed to pay any current installment. Otherwise the bonds held in trust were to be released by the trustees only upon the written consent of the Hopkins sisters or upon full *295 performance of the agreements by Birch and his wife. In the event the Hopkins sisters should elect at any installment date not to sell the bonds called for by the agreements, Birch and his wife had the option to declare the agreement at an end. Provision was also made that Birch and his wife, on 90 days' notice, might elect to buy bonds in advance of the regular installment dates provided and similarly might declare the entire agreement at an end if the Hopkins sisters should reject the offer. In respect of all purchases prior to January 1, 1929, Birch and his wife were to pay interest at the rate of six percent, the rate called for by the bonds. On purchases after that date, they were obligated to pay seven percent or one percent over the interest provided for in the bonds. In 1926 Birch entered into an agreement with the Conaways for the purchase of their interests in the ranch and in the bonds of Reclamation District No. 2035. The purchase price was paid in cash and in installments. Beginning with January 1, 1926, the first installment date under the agreements of January 10, 1925, the Hopkins sisters elected to sell the bonds to Birch and his wife pursuant to the terms of the *296 said agreements. Birch and his wife made the payments on the bond purchases as called for in the agreements and as elected by the Hopkins sisters until the early 1930's, when, due to the depression and a resulting lack of funds, they were unable to make the further payments on the dates prescribed, and extensions of time have thereafter been allowed. The bonds paid for in the face amount of $476,000 were delivered to Birch and his wife. The Hopkins sisters still hold the remaining $310,000 of the said bonds, but still hold Birch and his wife liable on their obligations under the agreements of January 10, 1925. Their interest is in the receipt of the cash payments provided for in the contracts and they are unwilling to accept anything else. Of the $476,000 par value of the bonds paid for by Birch and his wife and received from the Hopkins sisters, $10,000 par value of such bonds were sold to Lulu M. Minter and $86,000 passed into the hands of the Great Republic Life Insurance Company, a corporation of which Birch was president. There was later a dispute between petitioner and the insurance company over rights of petitioner in and to the said bonds, the exact basis for which dispute *297 is not shown. Beginning in 1925, up to and including 1934, Birch and his wife for the Conaway Ranch formally paid over $120,000 per year for disbursement as interest on the bonds of Reclamation District No. 2035. Such portion of the amount so paid as was applicable to bonds owned by Birch and his wife was repaid to them, but under a claim that interest on such bonds was tax exempt, the amounts so received were not reported by them as taxable income. In each of the said years. Birch and his wife, on their income tax returns, claimed a deduction of $120,000 as interest paid. The proprity of these deductions was questioned by the Bureau of Internal Revenue for practically every year, but in each instance the deduction was ultimately allowed. On October 15, 1934, Birch and his wife organized Birch Ranch and Oil Company, the petitioner, herein, and transferred to it the Conaway Ranch, their interest in the Birch Oil Company, the partnership which succeeded the Menges Oil Company in 1911, and all other property belonging to them, except the bonds of Reclamation District No. 2035, certain corporate stock and other properties having a value of about $600,000. Birch had been having difficulties *298 during the depression years in borrowing on his personal credit the moneys needed for the operation of the ranch, and the petitioner was organized for the purpose of procuring needed bank credit. Also on October 15, 1934, Birch and his wife organized a second Nevada corporation, to be known as Birch Securities Company. To that corporation they transferred $1,594,000 par value of the bonds of Reclamation District No. 2035, being all of the bonds of the district except the $310,000 still in the hands of the Hopkins sisters and those held by the insurance company and Lula M. Minter. Of the bonds so transferred, $1,214,000 were transferred subject to the trust under the contract with the Hopkins sisters. In addition, they transferred to the Securities Company the corporate stocks referred to in the preceding paragraph. Birch Securities Company was organized as a holding company, and solely for the personal convenience of Birch. It engaged in no other business than that of a holding company. Birch and his wife also organized on October 15, 1934, a corporation known as the Birch Holding Company, and transferred to it the stock of the petitioner and that of Birch Securities Company, which *299 stock had been received by them for the assets transferred to such corporations. Birch received 49 percent of the stock of the Holding Company, and his wife 51 percent. Birch Holding Company was organized solely for the purpose of holding the stock of the petitioner and that of Birch Securities Company. It has not conducted any other business. Birch became president of the three corporations. Mrs. Birch has left to him the determination of all matters pertaining to the administration of the affairs of the three corporations. At the time of its organization or on some date thereafter, the petitioner guaranteed performance by Birch and his wife of their contracts of January 10, 1925, with the Hopkins sisters. After its organization and for each of the years 1935 and 1936, the petitioner continued the practice of Birch and his wife of paying over $120,000 for disbursement as interest on the $2,000,000 of bonds of Reclamation District No. 2035. Beginning with 1937, however, no amount has been paid in any year by the petitioner as interest on the $1,594,000 of such bonds transferred by Birch and his wife to the Birch Securities Company, nor has it paid any amount as interest on the $86,000 *300 of such bonds held by the Great Republic Life Insurance Company. As to the bonds held by the insurance company, there was a dispute between that company and petitioner over petitioner's rights in and to those bonds. They were ultimately acquired by petitioner from the insurance company in 1940, for $65,000. For each of the fiscal years 1937 and 1939 the petitioner did pay $600 to Lula M. Minter as interest on the $10,000 par value of Reclamation District No. 2035 bonds which had been acquired by her. It also paid in each of those years $18,600 to the Hopkins sisters, that amount being six percent on $310,000, which was the amount still owing by Birch and his wife to the said sisters under the agreements of January 10, 1925, the payment of which had been guaranteed by petitioner, and was likewise the face amount of reclamation district bonds still in the bhans of the Hopkins sisters. On its books for the fiscal years 1937 and 1939, the taxable years herein, the petitioner accrued $120,000, to represent interest on the entire $2,000.000 par value of issued bonds of Reclamation District No. 2035. For the fiscal year 1937, it entered the $18,600 paid to the Hopkins sisters, as above *301 stated, as a loan to Birch Securities Company. Birch Securities Company, on its books, treated the receipt of the $18,600 as a loan from petitioner and charged a net of $17,382.75 as interest paid to the Hopkins sisters. It claimed a deduction on its income tax return for that year in the latter amount. At no time has any amount been paid into Reclamation District No. 2035, or set aside by Birch and his wife or the petitioner, for the purpose of paying off the bonds of the district, even though the bonds began to mature on January 1, 1935, at the rate of $227,000 per year. In November of 1934, steps were taken to refund the original bonds with refunding bonds to mature at the rate of $50,000 per annum, beginning January 1, 1945, and continuing through January 1, 1984, and on April 15, 1935, $2,000,000 par value of such refunding bonds were delivered to the County Treasurer. On June 25, 1935, the Superior Court of California in and for the County of Yolo entered its judgment holding that the refunding bonds constituted valid and legal obligations of the district. Except for the maturing dates, the refunding bonds are similar to the original bonds. At the time of the hearing herein, *302 all of the original bonds had been deposited for exchange but no exchange had occurred. Since its organization the petitioner has operated the Conaway Ranch, devoting it to the growing of crops and the raising of sheep. The petitioner, as owner of the Conaway Ranch, has borne all of the costs and expenses of maintaining and operating the improvements of Reclamation District No. 2035 and treats such costs as a part of its expenses in operating the ranch, all in a manner which would be no different if there were no reclamation district, whether formal or actual. The district has no expense not taken care of by the petitioner. All crops grown on the ranch during a given fiscal year are sold in the same year in which grown. The herd of sheep is kept at an average of 3,500, with losses being replaced by younger animals. All sales are made for cash, as are all purchases. The petitioner keeps a separate set of books with respect to the ranch operations. The ranch books are kept on a cash basis. For each of the taxable years involved in this proceeding petitioner used Form 1040 F in reporting income from the operations of the ranch, and reported the income or loss therefrom on a cash basis. *303 The petitioner does not own any oil properties directly, but it does have a partnership interest in Birch Oil Company, which does own and operate oil wells. It keeps its books and files its returns on the basis of a fiscal year ending September 30, while the Birch Oil Company keeps its books on a calendar year basis. At the close of its calendar year, Birch Oil Company determines its net income for the year and the amount distributable to each partner. The petitioner, as soon as it is informed of the amount, enters the said amount on its books as income as of the end of December. The amount thus entered is reported as income by petitioner in its return for the fiscal year ending on September 30 following. Usually the amount entered by petitioner at the end of each December as being its distributable share of partnership income actually operates to offset advances petitioner has obtained from the Birch Oil Company during the latter's calendar year. The advances so received by petitioner are carried on its books as loans from the Birch Oil Company. In addition to the ranch and the interest in the Birch Oil Company, the petitioner owns a citrus grove and various rental properties, *304 including two small farms. The income from and the expenses incident to those properties are entered on petitioner's books as they accrue. The petitioner in its income tax returns for the fiscal years 1937 and 1939 claimed for each year a deduction of $120,000, representing the amount accrued on its books to cover interest on the bonds of Reclamation District No. 2035. In determining the deficiencies, the respondent allowed the deductions to the extent of $600, being the amount paid to Lula M. Minter, but disallowed the deductions claimed to the extent of the balance of $119,400. On January 14, 1935, the petitioner and the Sacramento and San Joaquin Drainage District entered into an agreement styled "Option and Agreement." The instrument recited that the Yolo By-pass, which crosses the Conaway Ranch, was an integral part of the flood control project for the Sacramento Valley which had been adopted by Congress and by the Legislature of California, and that the State of California was required, as part of its share in completing the project, to acquire the necessary easement and flowage rights over the lands situated within the boundaries of the Yolo By-pass. By the agreement the petitioner *305 gave the Sacramento and San Joaquin Drainage District an option to purchase a perpetual right and easement for the passage of all floodwaters which might inundate two parcels of the ranch, one consisting of 3,045.2 acres and the other consisting of 6.529.6 acres, or a total of 9,574.8 acres. The total price to be paid, in the event of purchase, was $160,184, of which $40,046 was to be paid upon acceptance of the option, and the remainder was to be paid only if and when appropriations should be made by the California Legislature for such purpose. The agreement provided that if the full amount of $160,184 had not been paid prior to July 1, 1945, all rights of the Sacramento and San Joaquin Drainage District under the agreement should cease and that all payments theretofore made should be deemed full compensation for the use of the property by the district for flood control purposes during the period of the agreement. It was also provided that upon full payment of the $160,184 prior to July 1, 1945, the petitioner would contemporaneously execute and deliver a deed covering the specified rights and easements upon, over and across said lands. The petitioner received payments under the *306 above contract in 1935, 1936, 1937, and in at least one subsequent year, $52,280.12 being the amount received in 1937. On January 24, 1940, the option price of $160,184 having been received, the petitioner executed an indenture granting to the Sacramento and San Joaquin Drainage District, its successors and assigns, a perpetual right and easement, without recourse to compensation for damage therefrom, past, present or future, for the passage of all floodwaters across the two parcels of land. The total of the acreage recited in the deed was 9,586.34 acres. When the petitioner entered into the above agreement in 1935, it did not accrue any amount on its books with respect thereto. The payment of $52,280.12 received in 1937 was entered as cash received for flowage rights. In its income tax return for that year, petitioner reported the entire $52,280.12 as capital gain from the sale of flowage rights. In determining the deficiency for that year, the respondent made no change in the item as reported. Opinion To cover interest on the $2,000,000 of bonds issued by Reclamation District No. 2035, the petitioner in each of the taxable years accrued $120,000 on its books and deducted that *307 amount on its income tax return for each year. The respondent, in determining the deficiencies herein, allowed the deduction for each of the years to the extent of $600, representing the amount actually paid to Lula M. Minter as interest on the bonds held by her, and as to that amount there is no issue here. As to the remaining $119,400, the deduction claimed has been disallowed for each taxable year. The petitioner contends that such disallowance of the deduction was error and argues that the district was regularly organized; that the bonds were validly issued and are still outstanding; that they represented a legal obligation of the district; that interest in the amount of $120,000 accrued annually on the said bonds; that it, the petitioner, kept its books on an accrual basis and accrued the entire $120,000 on its books, in each of the taxable years; and since the $120,000 so accrued represented interest on the bonds of the district, it was entitled, under section 19.23 (c)-3 of Regulations 103, to deduct that amount in computing its net income, although the full amount claimed was not in fact paid. In the alternative, it is contended that in the event it be held that the petitioner's *308 books of account were not kept on an accrual basis, it should be allowed to deduct $18,600 of the amount disallowed, on the ground that that amount was in fact paid in each of the taxable years to the Hopkins sisters and represented interest on bonds owned by them. The respondent contends that in view of the closely controlled corporate arrangement there was in fact no real or actual obligation outstanding against the petitioner or its property to pay the interest claimed as deductions herein, and that petitioner is not therefore entitled to the deductions claimed. In making that argument, counsel for the respondent claims that Birch and his wife were in reality the beneficial owners of both the bonds and the Conaway Ranch, against which the bonds stood, the $10,000 of bonds in the hands of Lula M. Minter being excepted, and being both obligor and obligee that the payment of interest on the bonds by the petitioner amounted to nothing more than a payment by Birch and his wife to themselves, the theory being that under Higgins v. Smith, 308 U.S. 473, the petitioner, Birch Securities Company and Birch Holding Company, constituted the corporate pocketbook *309 of Birch and his wife. Further, the respondent contends that the petitioner, except for minor items, kept its books on a cash basis, and, in any event, was not entitled to deduct any amount in respect of interest which it did not actually pay. If the latter contention of the respondent is sound, his disallowance of the deductions claimed, except as to the $18,600 paid in each of the years to the Hopkins sisters, must be sustained, whether the bonds of Reclamation District No. 2035 were outstanding, as the petitioner contends, and whether they represented liens or charges actually outstanding against the Conaway Ranch and whether the district, Birch and his wife, and the petitioner are to be regarded as separate and distinct entities for the purposes herein, as the petitioner claims they must be. The evidence shows, and we have found as a fact, that the petitioner kept its books relating to its ranch operations on a cash basis and that the income from those operations was so reported. It does keep another set of books, which it is contended were kept on an accrual basis. Assuming, without deciding, that the second set of books was kept on an accrual basis, it would not be of any aid *310 to the petitioner in this matter. Where a taxpayer engages in more than one business and the businesses are septarate and distinct, he may keep the books and report the income for one business on a basis different from that on which he keeps the books for the other business. Joseph Stern, 14 B.T.A. 838. He may not, however, mingle items relating to one business on the books kept for the other business. The record definitely establishes that the amounts set up as accruals to cover interest on the bonds of Reclamation District No. 2035 related to the petitioner's ranching operations and not to the operations reflected in the second set of books. The operations other than those relating to the Conaway Ranch were those pertaining to the interest in the Birch Oil Company, previously held by Birch Oil Company, previously held by Birch and his wife, the management of a citrus grove and some rental properties which included two small farms. The accruals for interest on the reclamation district bonds had no connection whatever with such other properties. Assuming, as petitioner contends, that the bonds did evidence actual and real obligations outstanding and *311 that interest thereon did accrue, petitioner still is not entitled to deduct any amount in respect of such interest which it did not actually pay, the said liability being a part of the ranching operation, the books and accounts of which were kept on a cash basis. See Cecil v. Commissioner, 100 Fed. (2d) 896. To the same extent, the respondent's disallowance of the deductions claimed must be sustained under section 24(c) of the Revenue Act of 1936, [1] added thereto by section 301 of the Revenue Act of 1937, and section 24 (c) of the Internal Revenue Code. *312 With respect, however, to the $18,600 paid to the Hopkins sisters, we think the contrary conclusion must be reached. Even though it be said, as the respondent contends, that there was no subsisting bond obligation during the years before us because the obligor and obligee were one and the same, and there was therefore no payment of bond interest, there can be no gainsaying the fact that there was an obligation due and owing to the Hopkins sisters in the amount of $310,000, whether bond indebtedness or otherwise, on which the petitioner in each of the taxable years paid interest in the amount of $18,600. If the interest paid was not bond interest, it must have been interest on amounts still due for the purchase of bonds under the agreements of January 10, 1925, or for the purchase of the interests of the Hopkins sisters in the Conaway Ranch under the agreements of January 1, 1924. Whether it was one or the other, we think the petitioner is entitled to the deductions claimed for the interest so paid to the Hopkins sisters. It is true that the agreements of January 1, 1924 and January 10, 1925, were between the Hopkins sisters and Birch and his wife, and the obligations thereunder *313 arose prior to the time the petitioner came into existence, but it is likewise true that the petitioner on its creation succeeded to the rights and liabilities of Birch and his wife in and to the Conaway Ranch, and at the same time, or on some date thereafter, guaranteed the payments including interest for which Birch and his wife were liable under the agreements of January 10, 1925. Furthermore, the respondent himself contends that the realities of the situation require the conclusion that the petitioner and Birch and his wife are one and the same. In any event, however, the liability to pay principal and interest whether under the reclamation district bonds, under the agreements of January 10, 1925, or the agreements of January 1, 1924, is bottomed on the Conaway Ranch, and considering the rights and interest of the petitioner in and to the ranch and its commitments and obligations arising from its acquisition and ownership thereof, and its agreement guaranteeing performance of the January 10, 1925 agreements, the allowance of the interest deductions claimed, in so far as they relate to the payments to the Hopkins sisters, is in our opinion justified. In view of the conclusions *314 reached and the reasons therefor, we find it unnecessary to rule on the petitioner's claim that the bonds of Reclamation District No. 2035 were and are valid and subsisting obligations constituting a lien or charge upon the property of the petitioner so as to entitle it to deduct so much of the amounts paid thereunder as is allocated to interest. Neither do we find it necessary to rule on the contention of the respondent that the owners of the bonds here in question were in reality the owners of the land against which the bonds were issued, and that the bonds do not, therefore, represent real and actual obligations outstanding. The petitioner has alleged, and now contends, that the $52,280.12 received by it in 1937 under the "Option and Agreement" with the Sacramento and San Joaquin Drainage District were erroneously reported on its income tax return for 1937 as capital gain from the sale of flowage rights. It argues that a loss was in fact sustained. It does not claim a loss deduction, however, its theory, stated on brief, being that the transaction did not become a completed transaction until the year in which the final payment was made, which year was subsequent to 1937, and it *315 became obligated to deliver the deed. The respondent takes the position that the $52,280.12 received in 1937 was recorded and reported as income for that year, that the record does not show that it represented a return in part of petitioner's investment in the land, and that his action in not excluding the said amount in determining the deficiency for 1937 should be sustained. By the agreement entered into in 1935 with the Sacramento and San Joaquin Drainage District, the petitioner gave the district an option, exercisable prior to July 1, 1945, to acquire an easement upon two parcels of the ranch property. Payments under the agreement were to be made only if the California Legislature appropriated the money for that purpose. There was no fixed obligation to make the said payments, and if payments totaling $160,184 should not be made by July 1, 1945, the agreement was to terminate and the petitioner was to retain all of the payments which had been made as compensation for the use of its property. If by July 1, 1945, however, $160,184 had been paid, the petitioner was obligated to execute and deliver a deed conveying the easement. Under the terms of the agreement, there was no sale *316 of flowage rights until the total payments amounted to $160,184, which event occurred in a year subsequent to 1937. Until that event occurred, the character of the payments was not fixed and was not known. Such being the facts, no portion of the $52,280.12 constituted taxable income to the petitioner in 1937. Virginia Iron, Coal & Coke Co., 37 B.T.A. 195; affd., 99 Fed. (2d) 919; certiorari denied, 307 U.S. 630; and Friend M. Aiken, 10 B.T.A. 553; affd., 282 U.S. 277. Decision will be entered under Rule 50. Footnotes
1. SEC. 24. ITEMS NOT DEDUCTIBLE. * * * * *
(c) Unpaid Expenses and Interest. - In computing net income no deduction shall be allowed in respect of expenses incurred under section 23 (a) or interest accrued under section 23 (b) - (1) If not paid within the taxable year or within two and one-half months after the close thereof; and (2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and (3) If, at the close of the taxable year of the taxpayer or at any time within two and one-half months thereafter, both the taxpayer and the person to whom the payment is to be made are persons between whom losses would be disallowed under section 24 (b)↩.